# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN DARIO GARCIA, JR.,<br><br>               Plaintiff,<br><br>v.<br><br>SLEELEY et al.,<br><br>               Defendants. | Case No.: 3:14-cv-01525-JLS-RBM<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: GRANTING MOTIONS FOR SUMMARY JUDGMENT**<br><br>**[Docs. 160, 168.]** |

## I. INTRODUCTION

Plaintiff Ruben Dario Garcia, Jr., ("Plaintiff"), a California prisoner proceeding *in pro per* and *in forma pauperis*, has filed a lawsuit pursuant to 42 U.S.C. § 1983 against several medical staff members of the Richard J. Donovan Correctional Facility in San Diego, California ("RJD"). (*See* Doc. 43.) Plaintiff alleges that Defendants K. Seeley, D.O., an RJD physician (erroneously sued as "Sleeley," and referred to hereinafter as "Seeley"), A. Canlas, M.D., an RJD physician ("Canlas"), R. Walker, M.D., an RJD physician, ("Walker"), A. Denbela, an RJD nurse ("Denbela"), P. Newton, M.D., an RJD physician ("Newton"), Pamela Velardi, N.P., an RJD nurse ("Velardi") and M. Glynn, the RJD Health Care Chief Executive Officer ("Glynn") (collectively, "Moving Defendants") have violated his constitutional rights. (*Id.*) Specifically, Plaintiff alleges that Moving

Defendants conspired to—and did—retaliate against Plaintiff for filing medical grievances, complaints, and a habeas petition, by changing his pain management medication regimen. (*Id.*)

Moving Defendants have filed two motions for summary judgment. (Docs. 160, 168.) Velardi has moved for summary judgment on the ground that Plaintiff cannot establish the elements for which he carries the burden of proof at trial as to both causes of action.[1] (Doc. 160.) Seeley, Canlas, Walker, Denbela, Newton, and Glynn have moved for summary judgment on the grounds that they changed Plaintiffs medication based on empirical medical evidence rather than retaliation, and that they did not have a "meeting of the minds" to deprive Plaintiff of his preferred pain medication. (Doc. 163.)

These matters were referred to the undersigned Judge for Report and Recommendation Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 72.1(c)(1)(d). After a thorough review of the pleadings, moving and opposition papers, and the evidence submitted in support thereof, this Court respectfully recommends that both motions be **GRANTED**.

## II. PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS

In his Second Amended Complaint, Plaintiff asserted five claims against Moving Defendants herein and several medical staff members of the Substance Abuse Treatment Facility in Corcoran, California: (1) violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment; (2) retaliation after exercising Plaintiff's First Amendment right to free speech; (3) violation of Plaintiff's equal protection rights under the Fourteenth Amendment; (4) conspiracy to violate Plaintiff's civil rights; and (5) intentional infliction of emotional distress. (Doc. 43.) After extensive motion practice, only the retaliation and conspiracy causes of action were allowed to proceed as against

---

[1] Whereas Seeley, Canlas, Walker, Denbela, Newton, and Glynn are represented by the California Office of the Attorney General, Velardi retained private counsel and filed her own Motion for Summary Judgment.

1    Moving Defendants herein. (*See* Docs. 45, 62, 77, 90, 136.)

2         The allegations relevant to these causes of action and defendants are as follows:

3    Plaintiff is a California state prisoner in the custody of the California Department of

4    Corrections and rehabilitation. (Doc. 43, at 6.) At all times relevant to the surviving causes

5    of action, Plaintiff was incarcerated at RJD. (*Id.*) Beginning in 2007, Plaintiff began

6    experiencing pain in his right and arm, which was diagnosed as carpal tunnel syndrome.

7    (*Id.*, at 6-7.) In 2008, orthopedic specialist Dr. David Smith ("Dr. Smith") performed a

8    surgical procedure "to release pressure" that had built up in Plaintiff's right wrist. (*Id.,* at

9    7.) Dr. Smith also prescribed Tylenol Codeine #3, Motrin, and Acetaminophen as part of

10   a pain management regimen. (*Id.*) However, Plaintiff continued to experience pain from

11   the carpal tunnel syndrome and side-effects from the medications. (*Id.*, at 8.) Dr. Smith

12   did not renew Plaintiff's Tylenol Codeine #3 prescription and recommended that Plaintiff

13   return to see him or another orthopedic specialist if his issued persisted. (*Id.*, at 8-9)

14        Plaintiff continued to experience the symptoms of carpal tunnel syndrome and the

15   side-effects of his medications, so he requested different pain medication and a referral to

16   an orthopedic specialist. (*Id.,* at 8-9.) At this time, Canlas, Seeley, Velardi, Walker,

17   Newton, and Denbela were allegedly assigned to act as Plaintiff's "primary care providers"

18   at RJD; they allegedly denied Plaintiff's request for a referral, and instead prescribed

19   medication. (*Id.*, at 8-9.) Specifically, Plaintiff was prescribed Acetaminophen, Motrin,

20   Naproxen, Elavil, Amitriptyline, and Neurontin. (*Id.,* at 10-11.) However, these

21   medications caused Plaintiff to suffer abdominal cramps, nausea, blurred vision, fatigue,

22   and various other side-effects. (*Id.,* at 11.)

23        In June 2011, Plaintiff again requested alternative medications and a referral to an

24   orthopedic specialist. (*Id.,* at 12.) In response, Walker and other RDJ medical staff

25   allegedly cancelled Plaintiff's prescriptions for ibuprofen, acetaminophen, and Neurontin,

26   and substituted them for Indomethacin, Nortriptyline, and Gabapentin. (*Id.*, at 12-13.)

27   However, the new medications allegedly caused Plaintiff to suffer the same side effects as

28   the previous medications. (*Id.,* at 13.) In August 2011, Plaintiff allegedly underwent an

3

Electroneuromyographic/ Nerve Conduction ("EMG") study which showed "signs of nerve abnormalities in the right median innervated intrinsic muscle and ulnar nerve," and a physical examination which showed signs of additional nerve abnormalities around Plaintiff's right hand palm and wrist area." (*Id.*, at 14.)

Plaintiff continued to complain about the medications' side effects, but his requests for different medication and to be seen by an orthopedic specialist were denied. (*Id.*) On May 7, 2012, Plaintiff allegedly filed a state-court petition for writ of habeas corpus, seeking redress of Plaintiff's previously-filed complaints. (*Id.*) On May 10, 2012, Defendants allegedly cancelled all of Plaintiff's medications. (*Id.*) Plaintiff alleges that Defendants justified the cancellations by claiming that: (a) results of Plaintiff's blood test analysis showed he was not taking Gabapentin as prescribed; (b) Plaintiff had routinely refused his treatment; (c) Plaintiff was so disruptive during his regular visits that he could not be examined; and (d) Plaintiff did not show up for follow-up treatment. (*Id.*, at 16.) Plaintiff alleges that these reasons are entirely false. (*Id.*, at 17.)

After Defendants allegedly cancelled Plaintiff's prescriptions, Plaintiff continued to file medical grievances, but his requests for pain relief medication and a consultation with an orthopedic specialist were denied. (*Id.*, at 15.) Plaintiff alleges that he received no medical treatment for the remainder of his time at RJD. (*Id.*, at 16.)

Plaintiff alleges that Defendants' alleged cancellation of his prescriptions, denials of his subsequent appeals, and refusals to prescribe him new pain medication were in retaliation for exercising his First Amendment right to free speech. (*Id.*, at 28.) Plaintiff also alleges that Defendants conspired to violate his First Amendment right to free speech. (*Id.*, at 20.)

### III. STANDARD ON SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The standard for granting a motion for summary judgment is essentially the same as for the granting of a directed verdict. Judgment must be entered, "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "If reasonable minds could differ," however, summary judgment should not be entered in favor of the moving party. *Id.,* at 250-51.

The parties bear the same substantive burden of proof as would apply at a trial on the merits, including the plaintiff's burden to establish any element essential to his case. *Id.,* at 252. The moving party bears the initial burden of identifying the elements of the claim in the pleadings, or other evidence, which the moving party "believes demonstrate the absence of a genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. *S.E.C. v. Seabord Corp.,* 677 F.2d 1301, 1306 (9th Cir. 1982). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd.v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 317. Additionally, Rule 56(e) does not require that the moving party's motion always be supported by affidavits to show initially the absence of a genuine issue for trial. *Celotex,* 477 U.S. at 317. In fact, the party moving for summary judgment does not need "to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." *Id.,* at 325. Rather, "the burden on the moving party may be discharged by 'showing' –that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case. *Id.* However, it is not enough to simply state that the non-moving party cannot meet its burden at trial; the moving party must point to materials on file, gathered using the tools of discovery, which demonstrate that a party will not be able to meet its burden at trial. *Nissan*

*Fire & Marine Ins. Co., Ltd. V. Fritz Companies, Inc.,* 210 F.3d 1099, 1105-1106 (9th Cir. 2000).

The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. To rebut a properly supported motion for summary judgment, the nonmoving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff['s] favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v. Jefferson School Dis. No. 14J,* 208 F.3d 736, 738 (9th Cir. 2000).

While the district court is "not required to comb the record to find some reason to deny a motion for summary judgment," *Forsberg v. Pacific N.W. Bell. Tel. Co.,* 840 F.2d 1409, 1418 (9th Cir. 1988), the court may nevertheless exercise its discretion "in appropriate circumstances," to consider materials in the record which are on file but not "specifically referred to." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001). However, the court need not "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could be conveniently found." *Id.*

In ruling on a motion for summary judgment, the court need not accept legal conclusions "in the form of factual allegations." *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir. 1981). "No valid interest is served by withholding summary judgment on a complaint that wraps nonactionable conduct in a jacket woven of legal conclusions and hyperbole." *Vigliotto v. Terry,* 873 F.2d 1201, 1203 (9th Cir. 1989). Moreover, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir. 1997). While "the district court may not disregard a piece of evidence at the summary judgment state solely based on its self-serving nature," *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497-498 (9th Cir. 2015) (finding plaintiff's "uncorroborated and self-serving" declaration sufficient to establish a genuine issue of material fact because the "testimony was based on personal knowledge, legally relevant,

6

and internally consistent"), "[t]he district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence. *Id.*, at 497 (citations omitted). "[T]he court must consider whether the evidence presented in the affidavits is of sufficient caliber and quantity to support a jury verdict for the nonmovant. A 'scintilla of evidence' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (citations omitted.)

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). "We have repeatedly held that unauthorized documents cannot be considered in a motion for summary judgment." *Id.* "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-419 (9th Cir. 2001). *See also Fraser v. Goodale,* 342 F.3d 1042, 1046 (9th Cir. 2003) (holding "[a]t the summary judgment stage, the court must focus on the admissibility of the evidence's content, rather than its form).

## IV. EVIDENCE SUBMITTED

### A. Moving Defendants' Proffer

Moving Defendants have each submitted sworn declarations, portions of Plaintiff's medical records, his medical appeals, and doctor's notes corresponding to Plaintiff's medical examinations. (*See* Doc. 168-4 ("Canlas Decl."), Doc. 168-5 ("Denbela Decl."), 168-6 ("Glynn Decl."), Doc. 168-7 ("Newton Decl."), Doc. 168-8 ("Seeley Decl."), Doc. 168-9 ("Walker Decl."), Doc. 160-3 ("Velardi Decl.").) Velardi also submitted a declaration containing Plaintiff's discovery responses and portions of Plaintiff's deposition. (Doc. 160-2.) These materials contain information that would be admissible at trial, and the Court will consider them accordingly. *See* Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Evid. 803(4), (6).

On October 2, 2007, Plaintiff was diagnosed with carpal tunnel syndrome by UCSD neurologist Dr. Sean J. Evans. (Doc. 170, at 36, 62.) On February 19, 2008, Plaintiff underwent a "carpal tunnel release" surgery performed by Dr. Smith and received a prescription for Tylenol #3 (Codeine) and Motrin. (*Id.*, at 36, 66.) On August 21, 2009, Plaintiff was examined by Seeley after complaining about pain on his right hand. (Seeley Decl., ¶ 8; Ex. A.) At that examination, Seeley prescribed Plaintiff naproxen and home exercise therapy. (*Id.*)

**Inmate Appeal RJD HC 11022222[2]**

On May 16, 2011, Plaintiff was examined by Dr. Smith, the orthopedist who performed his carpal tunnel release surgery. (Glynn Decl., Ex. E.) At the examination, Plaintiff informed Dr. Smith that he was suffering serious and severe pain on a daily basis because of the nerve damage to his right hand. (*Id.*) Plaintiff requested an increased dosage of Gabapentin or alternatively a prescription for opiate medication, reasoning that if Dr. Smith provided the recommendation, then RJD staff physicians would comply. (Glynn Decl., ¶ 11, Ex. E.) However, Plaintiff claimed that Dr. Smith refused to prescribe medication because RJD physicians would not honor his recommendations. (*Id.*) Dr. Smith recommended an EMG study and issued Plaintiff a wrist brace. (*Id.*)

On June 7, 2011, Plaintiff submitted inmate appeal RJD HC 11022222, requesting that Dr. Smith ensure Plaintiff was receiving adequate medical care by prescribing effective pain medication and threatening to take legal action. (Glynn Decl., ¶ 11, Ex. E.) Plaintiff was interviewed by Dr. M. Martinez on August 11, 2011 regarding the appeal. (Glynn Decl., ¶ 12, Ex. E.) Dr. Martinez increased the dosage of Gabapentin, changed Plaintiff's Ibuprofen prescription to Indocin, and referred plaintiff for the previously recommended EMG study. (*Id.*)

---

[2] The parties have submitted evidence showing that Plaintiff received several medical examinations and filed several appeals before filing RJD HC 11022222. However, that evidence is unrelated to the claims at issue here; accordingly, the facts established by that evidence are immaterial, and will not be analyzed by the Court.

On August 25, 2011, Plaintiff submitted the appeal for a second-level review, claiming that the first-level decision was arbitrary, his prescribed pain medications were actually psychotherapeutic drugs which caused severe side effects, and he was receiving inadequate medical care. (Glynn Decl., ¶ 13, Ex. E.) Glynn performed the second-level review of this appeal and noted that Plaintiff had received the EMG study on August 26, 2011, the report of which was within normal limits and revealed that Plaintiff did not have a significant loss of wrist function. (Glynn Decl., ¶ 14, Ex. E.) Glynn noted that Plaintiff had been seen by an orthopedic specialist on September 22, 2011, was prescribed Gabapentin, Indomethacin, and Nortriptyline, had been examined by several doctors, and had been prescribed adequate pain medication. (*Id.*) Plaintiff submitted this appeal for third-level review on November 2, 2011, which was ultimately denied on March 15, 2012. (Glynn Decl., Ex. E.)

**The Habeas Petition**

On May 7, 2012, Plaintiff filed a Petition for a Writ of Habeas Corpus in San Diego Superior Court, alleging that the medical care he received, as outlined in appeal RJD HC 11022222, violated the Eighth Amendment. (Doc. 170, at 44.) The Petition mentioned Seeley, Canlas, and Glynn, but none of the other defendants herein. (Petersen Decl., Ex. 9.)

**Appeal RJD HC 12046268**

On May 10, 2012, Velardi examined Plaintiff in response to his complaints of abdominal pain. (Velardi Decl., ¶ 4; Glynn Decl., Ex. F.) Velardi reviewed Plaintiff's medical history and records, which showed Plaintiff had an EMG study performed on his right wrist in August 2011 that indicated normal motor and sensory nerve conduction and normal recruitment patterns and no evidence of denervation or increased irritability in his right wrist. (Velardi Decl., ¶ 4; Glynn Decl., Ex. F.) Velardi requested a that a lab study be performed to help determine the Gabapentin levels in his system. (Velardi Decl., ¶ 4.)

Also in May 2012, defendant Newton undertook a review of Plaintiff's medical records and laboratory test results. (Newton Decl., ¶ 4, Ex. A.) Newton's supervisor would

often ask Newton to interpret laboratory results, and take appropriate action based on accepted medical practice, if the inmate-patient's primary care physician was unable to review the results. (Newton Decl., ¶ 5.) In interpreting Plaintiff's lab test results, Newton concluded that Plaintiff was not taking his Gabapentin medication as instructed, based on observing an "incredibly high Gabapentin level in [Plaintiff's] urine on January 4, 2012." (Newton Decl., ¶ 6, Ex. A.) Newton knew from experience that inmate-patients would often "divert" their Gabapentin prescriptions by spitting out the medicine, collecting large amounts of the medication, and then taking it to get "high" or sell to other inmates. (Newton Decl., ¶ 6.) Based on his experience and review of the lab test results, Newton ordered Plaintiff tapered off Gabapentin on May 10, 2012. (*Id.*) Plaintiff's medical lab tests taken after he began tapering off Gabapentin showed that his Gabapentin level was lower than what would have been expected, even on a taper, further indicating that Plaintiff was not taking the Gabapentin as prescribed. (*Id.*, ¶ 7.)

On May 30, 2012, Plaintiff submitted inmate appeal RJD HC 12046268, alleging that he was not receiving adequate medical care with respect to his complaints of abdominal pain. (Glynn Decl., ¶ 15, Ex. F; Velardi Decl., ¶ 7.) Plaintiff was interviewed on July 2, 2012 by defendant Velardi in connection with this appeal. (Glynn Decl., ¶ 15, Ex. F.) At the interview, Plaintiff complained of left leg pain radiating to his testicles, but Velardi noted no testicular swelling, no nausea or vomiting, no diarrhea, and no penile discomfort. (Glynn Decl., ¶ 15, Ex. F; Velardi Decl., ¶ 7.) Velardi indicated that an abdominal examination showed dullness to percussion in the lower left quadrant and that Plaintiff might be constipated; she recommended increased fluid intake and gave Plaintiff a prescription for Fiberlax. (Glynn Decl., ¶ 15, Ex. F; Velardi Decl., ¶ 7.) Defendant Walker performed the first-level review of this appeal. (Walker Decl., ¶ 5, Ex. A.) Based on an empirical review of Plaintiff's appeal and medical records and his understanding of the accepted medical practices in the community at the time of the review, Walker found no improper treatment or failure to treat Plaintiff's pain or discomfort. (Walker Decl., ¶ 5.)

3:14-cv-01525-JLS-RBM

Plaintiff submitted this appeal for a second-level review, claiming that he was still suffering unrelenting pain, and requesting diagnostic testing and an appointment with a specialist. (Glynn Decl., ¶ 16, Ex. F.) Glynn's second-level review showed that Plaintiff had been examined by several doctors, received several "medication reconciliations" in order to renew his prescriptions, had several lab studies performed, and received appropriate medical care. (Glynn Decl., ¶ 15-22.)

Plaintiff submitted this appeal for a third-level review on October 15, 2012, claiming that the reviewing medical personnel denied his appeals in retaliation for Plaintiff's previously filed grievances. (Glynn Decl., Ex. F.) This appeal was ultimately denied. (*Id.*)

**Appeal RJD HC 12046389**

Plaintiff file inmate appeal RJD HC 12046389 on June 19, 2012, claiming that the discontinuation of his Gabapentin prescription and refusal to prescribe opiates were done in retaliation for filing a state habeas petition. (Denbela Decl., ¶ 3, Ex. A; Walker Decl., ¶ 6, Ex. B.) Defendant Denbela examined and interviewed Plaintiff in connection with this appeal on July 17, 2012, and did not find any evidence that medical staff were retaliating against Plaintiff or otherwise punishing him. (Denbela Decl., ¶ 3.) Denbela's examination also showed that Plaintiff had no functional limitations in his wrists, his EMG study results were within normal limits, he was offered nonsteroidal anti-inflammatory drugs ("NSAIDs"), and Gabapentin was not medically indicated. (*Id.*, ¶ 3.)

Walker's first-level review of this appeal, together with Plaintiff's medical records, showed that Plaintiff had received extensive medical treatment from several medical providers in response to his claims that he was being denied proper pain medication. (Walker Decl., ¶ 7, Ex. C.) Plaintiff's medical records also showed he was not taking Gabapentin as instructed, and although Plaintiff was offered alternative medication, he refused. (*Id.*) Walker found no evidence that Plaintiff was being denied medical treatment or pain medication in retaliation. (Walker Decl., ¶ 7.)

Plaintiff submitted this appeal for second-level review on August 22, 2012, claiming that he was receiving inadequate medical treatment in retaliation for filing a habeas

petition. (Seeley Decl., Ex. H.) Although Seeley's name appears twice on the appeal, Seeley delegated the task of conducting the review to another staff member. (Seeley Decl., ¶ 13.) The second-level reviewed showed that Plaintiff received extensive examinations by several medical providers regarding his claims, he had no functional limitations in his wrists, there was no medical indication for Gabapentin, and he initially refused alternative medications but eventually agreed to try acetaminophen. (*Id.*, ¶ 14-15.) Plaintiff submitted this appeal for third-level review on November 23, 2012, which was ultimately denied. (Seeley Decl., Ex. H.)

**Appeal RJD HC 12046765**

Plaintiff filed inmate appeal RJDHC 12046765 on August 14, 2012, appealing the discontinuation of his Gabapentin. (Walker Decl., ¶ 8, Ex. D; Glynn Decl., ¶ 23, Ex. G.) Specifically, Plaintiff claimed that the cancellation of his Gabapentin by Velardi and Newton was retaliatory, and that Walker and Denbela furthered those retaliatory acts by rejecting the appeal. (Walker Decl., ¶ 8, Ex. D; Glynn Decl., ¶ 23, Ex. G.) On September 18, 2012 Plaintiff was seen by Velardi in response to this appeal. (Velardi Decl., ¶ 9.) Plaintiff requested that his Gabapentin prescription be renewed for his right wrist pain; however, Plaintiff's right wrist showed evidence of full range of motion, strong grip equal to his left wrist, and normally capillary refill in the area, indicating that he had no acute pain issues. (*Id.*) Based on her examination of Plaintiff and her review of Plaintiff's EMG study results, she determined that Gabapentin was not medically indicated, because Plaintiff's wrist exhibited no functional disabilities. (*Id.*) Velardi noted that Plaintiff was tapered off Gabapentin after his serum levels tested low on May 16, 2012, and Newton gave the order to taper Plaintiff off Gabapentin on May 18, 2012. (Velardi Decl., ¶ 9; Walker Decl., Ex. D.) Velardi offered Plaintiff a prescription for Tegretol, but Plaintiff refused the medication, stated that no other medications worked except Gabapentin, and threatened a lawsuit. (Velardi Decl., ¶ 10.)

Walker performed the first-level review of this appeal, and based his findings on an empirical review of Plaintiff's appeal and medical records and his understanding of the

accepted medical practices in the community at the time. (Walker Decl., ¶ 9.) Walker found no evidence that Plaintiff was being denied medical treatment or pain medication in retaliation. (*Id.*)

Plaintiff submitted this appeal for second-level review on October 30, 2012, claiming that medical staff had falsified his medical records to cover up acts of misconduct. (Walker Decl., Ex. D.) Glynn performed the second-level review of this appeal. (Glynn Decl., ¶ 23.) Glynn found that Plaintiff was interviewed by Denbela on July 17, 2012, who addressed Plaintiff's right wrist pain and indicated that Plaintiff declined NSAIDS for his chronic right wrist pain. (*Id.*, ¶ 24.) Glynn also found that Plaintiff was examined by Velardi on September 18, 2012 for right wrist pain and Plaintiff's request to be prescribed Gabapentin. (*Id.*) However, Plaintiff's medical records and diagnostic testing showed that he had a "low serum Gabapentin level," meaning the Gabapentin was not being taken as prescribed; therefore, Plaintiff was tapered off Gabapentin. (*Id.*) Velardi also determined that Gabapentin was not medically indicated, and instead offered Plaintiff the medication Tegretol, but Plaintiff refused and threatened a lawsuit. (*Id.*) Glynn determined that Plaintiff was being treated appropriately, and that his medical condition did not warrant a prescription for Gabapentin. (*Id.*, ¶ 25.)

Plaintiff submitted this appeal for third level review on January 14, 2013[3], which was denied. (Walker Decl., Ex. D.)

**B. Plaintiff's Proffer**

Plaintiff has submitted his own sworn declaration along with a series of exhibits. (Doc. 170, at 34-240.)[4] Plaintiff has submitted: documents showing the diagnosis of his carpal tunnel syndrome (Ex. 1: Doc. 170, at 62-64); a series of medication administration

---

[3] Plaintiff dated his signature on the appeal form January 14, 2012, but it appears from the other dates on the appeal form that the date of the signature was actually January 14, 2013.

[4] Whereas Defendants have submitted their motion and supporting evidence in sub-parts, Plaintiff has submitted his motion and evidence as a single filing. As such, the Court will refer to Plaintiff's motion, declaration, and exhibits by their document and page numbers.

records and medication reconciliation forms from 2008 through 2012 (Ex. 2: Doc. 170, at 66-70); communications by Dr. Smith, the orthopedic surgeon who performed Plaintiff's carpal tunnel surgery, from 2008 through 2011 (Ex. 3, Doc. 170, at 72-75); Plaintiff's medical appeals while at RJD (Ex. 4: Doc. 170 at 77-142); portions of CDCR pain management guidelines from 2009 (Ex. 5: Doc. 170, at 144-146); selections from the California Code of Regulations, Title 15 (Ex. 6: Doc. 170, at 148-151); an Electroneuromyographic Report dated August 26, 2011 (Ex. 7: Doc. 170, at 153-156.); the San Diego Superior Court Order denying Plaintiff's state habeas petition (Ex. 8: Doc. 170, at 160-168); a series of doctor's notes from May to September 2012 (Ex. 9: Doc. 170, at 170-174); an inmate appeal directing Plaintiff to use a different form (Ex. 10: Doc. 170, at 176.); lab test results dated May 22, 2012 (Ex. 11: Doc. 170, at 178); a "Psychiatry MD Progress Note" dated January 10, 2013 (Ex. 12: Doc. 170, at 180); excerpts from Plaintiff's deposition on November 27, 2018 (Ex. 13: Doc. 170, at 182-187); and selected defendants' responses to Plaintiff's interrogatories. (Ex. 14: Doc. 170, at 188-237.)

Plaintiff has also submitted his own declaration, which will be considered by the Court: however, to the extent that Plaintiff's declaration contains conclusory allegations rather than admissible facts, it will be disregarded. *See Nigro*, 784 F.3d at 497.

After a thorough review of the parties' proffered evidence, it appears that the facts, in large part, are not in dispute. However, Plaintiff disputes Newton's conclusion that Plaintiff was misusing Gabapentin. (Doc. 170, at 6.) Specifically, Plaintiff declares that when he was given Gabapentin, it was administered "crushed and floated in water;" thus, if his Gabapentin levels were too low or too high, it was because the dose administered by RJD staff members was inaccurate. (*Id.*, at 58, 66-70.) Additionally, Plaintiff disputes that Velardi did not know of Plaintiff's exercise of his First Amendment rights: he declares that he informed Velardi of his habeas petition during his May 10, 2012 visit. (*Id.*, at 45.) Plaintiff disputes that he refused alternative medication, and that he was offered alternative medication by Velardi. (*Id.*, at 54, 58.) Finally, Plaintiff declares that prison staff, including Velardi, falsified his medical records in order to justify the cancellation of his

1    medication. (*Id.*, at 55.)

## V. DISCUSSION

Velardi moves for summary judgment on Plaintiff's retaliation claim and argues that Plaintiff cannot meet his burden of proof at trial to show Velardi took an adverse action against him because: (a) Velardi was unaware of Plaintiff's habeas petition; (b) Velardi never cancelled any of Plaintiff's pain medications; and (c)Velardi prescribed Plaintiff alternative pain medications, showing that she was not withholding medicine. (Doc. 160-1, at 9-13.)   The remaining defendants move for summary judgment on Plaintiff's retaliation claim and argue that they did not retaliate against Plaintiff because their conduct was based on empirical medical evidence, rather than Plaintiff's exercise of his First Amendment rights. (Doc. 168-1, at 14-17.)

Velardi moves for summary judgment on Plaintiff's conspiracy claim and argues that plaintiff can show neither: (a) the requisite "meeting of the minds;" nor (b) any underlying constitutional violation.  (Doc. 160-1, at 13-15.)  The remaining defendants move for summary judgment on Plaintiff's conspiracy claim and argue that: (1) Plaintiff cannot produce evidence showing a "meeting of the minds;" and (2) their actions were based on empirical medical evidence and a review of Plaintiff's records and allegations in his inmate appeals.  (Doc. 168-1, at 18-19.)   Plaintiff argues he has provided evidence sufficient to show a dispute of material fact, specifically that Moving Defendants' alleged falsification of his medical records shows they acted in concert to retaliate against him for exercising his First Amendment rights.  (Doc. 170, at 27-28.)

The record before the Court shows the Moving Defendants have carried their burden of demonstrating the absence of a genuine issue of material fact as to whether they retaliated against Plaintiff for exercising his First Amendment rights, and whether they conspired to do so.   Moving Defendants have also demonstrated that they are entitled to judgment as a matter of law.   Therefore, it is respectfully recommended that the Court **GRANT** Moving Defendants' summary judgment motions.

/ / /

3:14-cv-01525-JLS-RBM

## A. First Amendment Retaliation

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities and as well as a right of meaningful access to the courts." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); see also *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) ("[P]risoners have a First Amendment right to file prison grievances."); *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). "Retaliation against prisoners for their exercise of this right is itself a constitutional violation, and prohibited as a matter of 'clearly established law.'" *Brodheim*, 584 F.3d at 1269 (citing *Rhodes*, 408 F.3d at 567 and *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995)). There are five basic elements for a viable claim of First Amendment retaliation in the prison context: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Brodheim*, 584 F.3d at 1269 (quoting *Rhodes*, 408 F.3d at 567-68).

A prison official's actions are "adverse" in satisfaction of the first element when a person of ordinary firmness would have been chilled in the exercise of his First Amendment rights. *See Broadheim*, 584 F.3d at 1269. The adverse action need not be so serious as to amount to a constitutional violation. *Watison v. Carter,* 668 F.3d 1108, 1114 (9th Cir. 2012); *Hines v. Gomez,* 108 F.3d 265, 269 (9th Cir. 1997). In fact, "insignificant retaliatory acts" are generally not actionable. *Morris v. Powell,* 449 F.3d 682, 685 (5th Cir. 2006); *accord Walker v. Bowersox,* 526 F.3d 1186, 1190 (8th Cir.2 008); *see also, e.g., Ransom v. Aguirre,* No. 1:12cv01343 2013 WL 398903, at *4 (E.D. Cal. Jan. 31, 2013) (noting that "not every allegedly adverse action is sufficient" to support a retaliation claim). The plaintiff must show that the harm he suffered was more than minimal, at least where he alleges that the adverse action would chill a person of ordinary firmness. *See Brodheim,* 584 F.3d at 1267; *Rhodes,* 408 F.3d at 567 n. 11. For example, the denial of a grievance or administrative appeal does not amount to an adverse action sufficient to deter a person of ordinary firmness from further First Amendment activities. *See Dragasits v. Rucker,*

No. 3:18-cv-00512-WQH-AGS at *5, 2019 WL 4276072 (S.D. Cal. September 6, 2018). *See also Dicey v. Hanks,* No. 2:14-cv-2018 JAM AC P, 2015 WL 4879627, at *5 (E.D. Cal. Aug. 14, 2015) (collecting cases) ("[D]enial of a grievance neither constitutes an adverse action that is more than de minimis nor is it sufficient to deter a prisoner of "ordinary firmness" from further First Amendment activities.").

To satisfy the second element, the plaintiff "must allege a causal connection between the adverse action and the protected conduct," *Watison,* 668 F.3d at 1114, and demonstrate "that his protected conduct was 'the substantial or motivating factor behind the defendant's conduct.' *Brodheim,* 584 F.3d at 1271. The plaintiff must "put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to the [defendant's] intent" in undertaking the retaliatory act. *Id.* (quoting *Bruce v. Ylst,* 351 F.3d 1283, 1289 (9th Cir. 2003)). The evidence of retaliatory motive a plaintiff must offer to survive summary judgment must be "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]." *Allen v. Iranon,* 283 F.3d 1070, 1077 (9th Cir. 2002). When a plaintiff fails to offer direct evidence, he must provide circumstantial evidence of: "(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse ... action were false and pretextual." *Id.*; *see also McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011), *superseded by statute on other grounds.* However, circumstantial evidence of timing, without more, is insufficient. *See Pratt,* 65 F.3d at 808. Mere speculation that a defendant acted in retaliation is insufficient at the summary judgment stage. *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (affirming grant of summary judgment when there was no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit).

As to the third element, filing a grievance is a protected action under the First Amendment. *Watison,* 668 F.3d at 1114; *Valandingham v. Bojorquez,* 866 F.2d 1135, 1138

(9th Cir.1989). Pursuing a civil rights legal action is similarly protected under the First Amendment. *Rizzo v. Dawson,* 778 F.2d 527, 532 (9th Cir. 1985). Likewise, filing a petition for a writ of habeas corpus is protected under the First Amendment. *See Hebbe v. Pliler,* 627 F.3d 338 (9th Cir. 2010).

Fourth, the plaintiff must show that the adverse action either chilled his own First Amendment exercise or would chill that of a person of ordinary firmness. *Brodheim*, 584 F.3d at 1269–1270; *Rhodes*, 408 F.3d at 568–569. A plaintiff need not demonstrate that his First Amendment rights were totally "inhibited or suppressed" because "it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Rhodes*, 408 F.3d at 568–569 (citing *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)). A plaintiff can establish that an action would silence a person of ordinary firmness by showing that the action caused harm that was more than minimal. *Watison*, 668 F.3d at 1114; *Brodheim*, 584 F.3d 1262; *Rhodes*, 408 F.3d at 567, n. 11.

With respect to the fifth element, a prisoner must affirmatively show that "the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." *Rizzo,* 778 F.2d at 532; *accord Watison,* 668 F.3d at 1114.

### 1. Velardi

Plaintiff claims that Velardi cancelled Plaintiff's Gabapentin prescription in retaliation for Plaintiff filing medical grievances and a state habeas petition. (Doc. 170, at 16-17.) However, Velardi has sufficiently shown that Plaintiff cannot carry his burden of proving that Velardi's actions were adverse or that she made her medical decisions because of Plaintiff's exercise of free speech.

#### a. adverse action

On May 10, 2012, Velardi examined Plaintiff in response to his complaints of abdominal pain. (Velardi Decl., ¶ 4.) Velardi reviewed Plaintiff's medical history and records, which showed Plaintiff had an EMG study performed on his right wrist in August

2011. (*Id.*) The results of the EMG study indicated normal motor and sensory nerve conduction and normal recruitment patterns and showed no evidence of denervation or increased irritability in his right wrist. (*Id.*) At the examination, Plaintiff did not present symptoms of fever, chills, edema, or respiratory issues. (*Id.*) According to Velardi, Plaintiff was threatening and argumentative during the assessment and was questioning Velardi's conclusions. (*Id.*) Velardi did not place any order to taper or stop Plaintiff's Gabapentin or other medication on May 10, 2012. (Velardi Decl., ¶ 6.) Another healthcare provider, Newton, ordered the taper-off of Gabapentin. (Velardi Decl., ¶ 6, Ex 4; Newton Decl., ¶ 4, Ex. A.) Velardi only requested an order that a lab study be performed to help determine the Gabapentin levels in his system. (Velardi Decl., ¶ 4.)

On September 18, 2012, Velardi performed another examination in response to Plaintiff's complaint requesting that his Gabapentin prescription be renewed, in connection with appeal RJD HC 12046765. (Velardi Decl., ¶ 9; Walker Decl., Ex. D.) During this examination, Plaintiff's right wrist showed evidence of full range of motion, strong grip equal to the left wrist, and normal capillary refill; this indicated that Plaintiff had no acute pain issues and no functional limitation. (Velardi Decl., ¶ 9, Ex. 6; Walker Decl., Ex. D.) Based on Velardi's review of Plaintiff's August 2011 EMG study, his medical history, his presenting symptoms, and Velardi's assessment, she concluded that Gabapentin was not medically indicated. (Velardi Decl., ¶ 9, 12, Ex. 6; Walker Decl., Ex. D.) In Velardi's medical judgment, Gabapentin was not an appropriate medication to treat subjective pain complaints which were not supported by her observation and assessment of Plaintiff's symptoms. (Velardi Decl., ¶ 12.) Instead, she offered Plaintiff another more appropriate medication (Tegretol), which she believed more appropriately treated his presenting symptoms. (*Id.*) However, Plaintiff refused the medication. (Velardi Decl., ¶ 9, Ex. 6; Walker Decl., Ex. D.)

During discovery, Plaintiff was asked to produce documents supporting his First Amendment retaliation claim and his contentions that Velardi took adverse actions against him and cancelled his prescriptions: he produced his medical records, written complaints,

and grievances filed during his time at RJD. (Petersen Decl., at 20.) When Plaintiff was asked to identify all facts, documents, and witnesses supporting his First Amendment retaliation claim against Velardi, to specify the adverse actions Velardi took against him, and to identify documents demonstrating that Velardi cancelled his prescriptions, Plaintiff could not identify any witnesses, and again referred to his medical records, complaints, and grievances filed during his time at RJD. (*Id.*, at 23.) Based on the record before the Court, Velardi has produced admissible evidence that she did not in fact order the cancellation of Plaintiff's Gabapentin prescription. And, even if she did, Plaintiff has not produced evidence that he was in fact chilled from exercising his First Amendment rights, or that cancelling an unnecessary medication and offering an alternative would chill a person of ordinary firmness from exercising their First Amendment rights. As such, the record does not substantial Plaintiff's claims that Velardi took any adverse action against him.

Because Velardi has carried her burden on summary judgment of showing that Plaintiff cannot prove an essential element of his claim—that Velardi took some adverse action against him—and Plaintiff has not demonstrated the existence of a genuine issue of material fact as to this element of a retaliation claim, a finder of fact could not find in his favor. *See Reese,* 208 F.3d at 738. Although Plaintiff's failure to prove an essential element of his case renders all other facts nonmaterial, *see Celotex*, 477 U.S at 322-323, the Court will further consider whether a genuine dispute exists as to the causation element of Plaintiff's retaliation claim against Velardi as well.

### b. causal connection

Velardi swears that during her May 10, 2012 assessment of Plaintiff, he did not make her aware of any habeas petition filed on May 7, 2012 regarding the CDCR's alleged refusal to prescribe opiate medications for chronic pain; nor did she receive any notifications from the CDCR about a pending complaint against her. (Velardi Decl., ¶ 5.)

Velardi further declares that at the time of the September 18, 2012 examination she was unaware of any active lawsuit against her, and that she had not been served with any lawsuit prior to the assessment. (*Id.*, ¶ 11.) Additionally, Velardi attests that she did not

decline Plaintiff's request for Gabapentin because of any complaint or lawsuit against her or any other CDCR healthcare provider—in fact, she declares that Plaintiff first threatened to file a lawsuit during the September 18, 2012 assessment *after* she informed him that his Gabapentin request would be denied. (*Id.*, ¶ 13.) (Emphasis added.)

Plaintiff disputes Velardi's claim that she was unaware of the grievances, lawsuit, and habeas petition, declaring that at his May 10, 2012 examination by Velardi, he specifically told her about his habeas petition and the reasons for filing it. (Doc. 170, at 30, 184.) Plaintiff also declares that he filed a grievance on June 19, 2012 against Velardi accusing her of cancelling his pain medication in retaliation. (*Id.*, at 30.) Plaintiff declares that because he mentioned Velardi in the body of appeal RJD HC 12046765, Velardi was necessarily aware that Plaintiff had filed grievances against her. (*Id.*) Plaintiff further declares that the CDCR has a policy of notifying its staff of any inmate grievances filed against them. (*Id.*, at 52.) However, Plaintiff does not cite to any regulation in Title 15 of the California Code of Regulations that supports this assertion.

Notably, there is an absence of evidence that would indicate Velardi retaliated against Plaintiff in rendering her decision in appeal RJD 12046765; there is only Plaintiff's assertion that Velardi used her position as a reviewer to "further the retaliatory acts carryout [sic] by Velardi..." (*Id.*, at 23.) The evidence that supports a retaliatory motive is scant: Plaintiff declares that he filed his habeas petition on May 7, 2012 and that he was seen by Velardi on May 10, 2012. (*Id.*, at 40.) A three-day period between Plaintiff's exercise of protected first amendment activity and an allegedly adverse action by prison officials may show a retaliatory motive; however, circumstantial evidence of timing alone is insufficient. *Pratt,* 65 F.3d at 808.

Plaintiff also declared that he told Velardi about the habeas petition at the May 10, 2012 examination. (*Id.*, at 45.) However, during his deposition, Plaintiff made contradictory claims and admitted he was not sure if Velardi was mentioned in his habeas petition at all, and that the crux of his retaliation claim was Velardi's action after he told her about his grievances and court actions. (*Id.*, at 185.) Finally, Plaintiff relies on a

21

"Psychiatry MD Progress Note" in arguing that Velardi falsified his medical records to show that he refused a prescription for Tegretol. (*Id.*, at 54, 180.) The progress note indicates Plaintiff was not complying with medication procedures, but also that Plaintiff was receiving medication every day. (*Id.*, at 180). However, the progress note indicates that "Prozac is the only med prescribed." (*Id.*) This combined with the designation "Psychiatry MD" shows that the progress note is limited to Plaintiff's psychiatric treatment team, because the bulk of Plaintiff's medical records demonstrate that at no time was he solely prescribed Prozac. The same conclusion is supported by Plaintiff's deposition testimony that only his "mental health treatment providers" reviewed the issue of inconsistent medication reports. (*Id.*, at 185.)

Erroneous entries by psychiatric nurses do not show that Velardi falsified her doctor's notes. Notably, there are no apparent irregularities in Velardi's treatment of Plaintiff or her medical notes (a fact corroborated by no less than four other reviewers). There is no evidence that Velardi made any statements to Plaintiff or to her colleagues that her decisions were due to, or influenced by, Plaintiff's exercise of his First Amendment rights. Instead, the record before the Court shows that Velardi did not act with a retaliatory motive; rather, she based her decisions on Plaintiff's medical history and her own medical expertise.

Velardi has demonstrated that Plaintiff cannot carry his burden at trial of proving a causal connection between Velardi's actions and Plaintiff's protected conduct. Plaintiff has failed to introduce evidence sufficient to create a genuine dispute of material fact as to Velardi's motive such that a reasonable trier of fact could find in his favor. Therefore, it is respectfully recommended that the Court **GRANT** summary judgment in favor of Velardi as to Plaintiff's First Amendment retaliation claim.

### 2. Newton

Plaintiff claims that Newton cancelled Plaintiff's Gabapentin prescription in retaliation for Plaintiff filing medical grievances and a state habeas petition. (Doc. 170, at 16-17.) However, Newton has demonstrated that Plaintiff cannot carry his burden to prove

3:14-cv-01525-JLS-RBM

Newton's retaliatory motive.

Newton's interaction with Plaintiff was limited to a review of Plaintiff's medical records and laboratory test results. (Newton Decl., ¶ 4, Ex. A.) Based on his professional opinion, Newton found that Plaintiff's lab test results showed he should be tapered off Gabapentin, because he was not taking his Gabapentin as instructed. (*Id.*) Specifically, Newton observed that Plaintiff had "an incredibly high Gabapentin level" in his urine on January 4, 2012, and that Plaintiff's lab tests after he began tapering off Gabapentin showed a lower Gabapentin level than would have been expected even on the taper. (Newton Decl., ¶ 6.) Additionally, Newton's review of Plaintiff's medical records showed that there was no indication that Plaintiff needed Gabapentin because an EMG study and other medical exams showed that Plaintiff did not have carpal tunnel syndrome at the time. (*Id.*, ¶ 4.) The "Medication Reconciliation" form attached to Newton's declaration, and also submitted by Plaintiff, shows that on April 18, 2012, Plaintiff was prescribed Gabapentin by nurse practitioner A. Seifulla, to be taken "crushed and floated" three times a day. (Newton Decl., Ex. A; Doc. 170, at 68.) The Gabapentin prescription was set to expire on May 16, 2012 (Newton Decl., Ex. A) — the same date that Plaintiff complains that his medication was cut off as part of a conspiracy to retaliate against him for exercising his First Amendment rights. Newton declares that he did not deny Plaintiff a Gabapentin prescription to retaliate against him; rather, Newton's decision was based on a review of Plaintiff's medical records, laboratory results, and empirical medical evidence showing that Plaintiff did not need Gabapentin. (Newton Decl., ¶ 8.)

Plaintiff claims that Newton ordered a taper-off of his Gabapentin prescription on May 10, 2012 in retaliation for filing a habeas petition and grievances, subsequently ordered blood testing on May 16, 2012, and then retroactively used the results of the blood test (which showed low levels of Gabapentin due to the taper-off) to justify his decision. (Doc. 170, at 16.) Plaintiff declares that when he was given Gabapentin, it was administered "crushed and floated in water;" thus, if his Gabapentin levels were too low or too high, it was because the dose administered by RJD staff members was inaccurate. (*Id.*,

at 58.) Newton's declaration corroborates that at the time Plaintiff was taking Gabapentin between April and May 2012, it was ordered to be crushed and floated in water. (Newton Decl., Ex. A.) However, Plaintiff admitted at his deposition that he misses doses of his prescribed medication—i.e., that he does not take his medication as prescribed. (Doc. 170, at 185.)

Based on the record before the Court, Plaintiff's assertions as to motive are conclusory. There is no evidence that Newton mentioned any lawsuits or grievances filed against him, either to Plaintiff or to other colleagues; in fact, the record shows that there was no interaction between the two at all. There is no evidence that Newton stated his decision was motivated by Plaintiff's exercise of his First Amendment rights. Like Plaintiff's allegations against Velardi, the only evidence that supports the inference of a causal connection is Plaintiff's declaration that he filed his habeas petition on May 7, 2012 and that Newton cancelled his Gabapentin prescription on May 10, 2012. (*Id.*, at 30, 184.) But, Plaintiff has not provided additional evidence that supports the inference. *Pratt,* 65 F.3d at 808. Rather, the record indicates that Newton's decision was based on his analysis of Plaintiff's medical needs rather than retaliatory motive.

As such, Newton has demonstrated that Plaintiff cannot carry his burden at trial of proving that Newton acted with a retaliatory motive. Plaintiff has failed to introduce evidence sufficient to create a genuine dispute of material fact as to a causal connection between Newton's action and Plaintiff's protected conduct. Accordingly, it is respectfully recommended that the Court **GRANT** summary judgment in favor of Newton as to Plaintiff's First Amendment retaliation claim.

### 3. Denbela

Plaintiff claims that Denbela furthered the retaliatory actions taken against him by denying the first level review of appeal RJD HC 12046389. (*See* Doc. 170, at 20; Walker Decl., Ex. B.) However, Denbela has shown that Plaintiff cannot carry his burden at trial of proving that Denbela's motive was retaliatory.

/ / /

24

Denbela examined and interviewed Plaintiff in connection with appeal RJD HC 12046389 on August 2, 2012. (Denbela Decl., ¶ 3.) Denbela reviewed Plaintiff's medical records before the examination and found no evidence that medical staff were retaliating or punishing Plaintiff. (*Id.*) Denbela's examination showed Plaintiff had no functional limitations in his wrists, Plaintiff's EMG study results were within normal limits, and there was no medical indication for Gabapentin. (*Id.*) Denbela's conclusions were based on a review of Plaintiff's medical records, the examination and interview, and her experience, education, and training. (*Id.*)

Denbela declares that she did not retaliate against Plaintiff in treating him or making her medical recommendations, and that she never cancelled any of Plaintiff's medications in retaliation. (*Id.*, ¶ 4.) Denbela swears her treatment of Plaintiff was proper based on her examination, a review of Plaintiff's medical records, her observations of Plaintiff during the interview, and based on her medical education, training, experience, and accepted medical practice. (*Id.*, ¶ 4.) Denbela has carried her burden of demonstrating that Plaintiff cannot prove an essential element of his case.

Plaintiff's only evidence that Denbela retaliated against him is his own declaration, which lays out Denbela's medical findings. (Doc. 170, at 51-52.) But this evidence alone does not demonstrate a genuine dispute of material fact as to Denbela's motivation for denying appeal RJD HC 12046389. There is no evidence that Denbela mentioned any of Plaintiff's First Amendment activities; no evidence of irregularities in Plaintiff's treatment or in the processing of appeal RJD HC 1204639. The only evidence tending to show Denbela acted in retaliation was the fact that Denbela denied his medical appeal. This evidence is simply not enough to create a material dispute however, because the denial of a grievance alone by itself does not amount to a constitutional violation. *See Dicey v. Hanks,* No. 2:14-cv-2018 JAM AC P, 2015 WL 4879627, at *5 (E.D. Cal. Aug. 14, 2015.) Plaintiff has failed to show a genuine dispute of material fact as to whether the substantial motivating factor behind Denbela's denial of appeal RJD HC 12046389 was Plaintiff's

/ / /

protected conduct. As such, it is respectfully recommended that the Court **GRANT** summary judgment in favor of Denbela on Plaintiff's First Amendment Retaliation Claim.

### 4. Walker

Plaintiff claims that Walker, like Denbela, also retaliated against him by denying the first level review of appeal RJD HC 12046389, and by denying the first level review of appeal RJD HC 12046765. (*See* Doc. 170, at 20; Walker Decl., Ex. B.) However, Walker has demonstrated that Plaintiff cannot carry his burden at trial of proving a retaliatory motive.

Walker never personally examined or treated Plaintiff; rather, Walker performed first level reviews of Plaintiff's medical appeals. (Walker Decl., ¶ 3.) Walker's first level review of inmate appeal RJD HC 12046389 showed that despite Plaintiff's claims that he was being denied medical treatment in retaliation, he received extensive examination from several medical providers. (Walker Decl., ¶ 7, Ex. B.) Walker's review also showed that Plaintiff was not taking his Gabapentin as instructed, and found no evidence that Plaintiff was being denied medical treatment or pain medication in retaliation. (*Id.*) These findings were based on an empirical review of Plaintiff's appeal and medical records, and Walker's understanding of the accepted medical practices in the community at the time. (Walker Decl., ¶ 8, Ex. B.) Walker's first level review of inmate appeal RJD HC 12046765 also did not show that Plaintiff was being denied medical treatment or pain medication in retaliation; these findings too were based on an empirical review of Plaintiff's appeal and medical records, and Walker's understanding of accepted medical practices in the community at the time. (Walker Decl., ¶ 9, Ex. D.)

Walker declares that he did not retaliate against Plaintiff in making his appeals decisions; rather, his findings were based on an empirical review of Plaintiff's appeal and medical records, and his understanding of the accepted medical practices in the community at that time. (Walker Decl., ¶ 11.)

Plaintiff's only evidence that Walker retaliated against him is his own declaration, which lays out Walker's findings in the first level reviews of appeals RJD HC 12046389

and RJD HC 12046765. (Doc. 170, at 52-54.) The only evidence tending to show Walker acted in retaliation was the fact that Walker denied two of Plaintiff's medical appeals. But, this is not enough evidence to show a genuine dispute of material fact as to Walker's motivation for denying appeals RJD HC 12046389 and RJD HC 12046765. *See Dicey*, 2015 WL 4879627, at \*5. As such, it is respectfully recommended that the Court **GRANT** summary judgment in favor of Walker on Plaintiff's First Amendment Retaliation Claim.

### 5. Seeley

Plaintiff claims that Seeley furthered the retaliatory actions taken against him by denying the second level review of appeal RJD HC 12046765. (*See* Doc. 170, at 23; Seeley Decl., Ex. K.) But, Seeley has shown that Plaintiff cannot carry his burden at trial of proving that Seeley's motive was retaliatory.

Seeley acted as a second level reviewer for Plaintiff's health care appeal 12046765, wherein Plaintiff claimed he had never refused treatment, and that Velardi had falsified his medical records to cover up illegal acts and misconduct by RJD staff. (Seeley Decl., ¶ 16, Ex. K.) Seeley signed the second level review on December 20, 2102. (Seeley Decl., ¶ 16.) Seeley determined that Plaintiff was treated by Denbela on July 17, 2012, who addressed Plaintiff's complaints of right wrist pain and indicated that Plaintiff declined a prescription for NSAIDS. (Seeley Decl., ¶ 17, Ex. K.) Seeley also found that Velardi interviewed and examined Plaintiff on September 18, 2012 in response to Plaintiff's complaints of right wrist pain and his request or Gabapentin. (*Id.*) Plaintiff's medical records and diagnostic testing showed that he had a "low serum Gabapentin level," meaning that he was not taking the Gabapentin as prescribed; therefore, he was tapered off Gabapentin. (Seeley Decl., ¶ 18, Ex. K.) Seeley found that Velardi determined Gabapentin was not medically indicated, and instead offered Plaintiff a prescription for Tegretol, which Plaintiff declined. (*Id.*) Seeley determined that Plaintiff was being treated appropriately, and that his medical condition did not warrant a prescription for Gabapentin. (Seeley Decl., ¶ 19.)

/ / /

Like Newton, Denbela, and Walker, Seeley declares he did not retaliate against Plaintiff in making his treatment decisions, or in making the recommendations after interviewing and reviewing Plaintiff's health care appeals. (*Id.*, ¶ 22.) Seeley declares that he never refused to examine, treat, or prescribe pain medications to Plaintiff, that in Seeley's professional opinion, were medically necessary and reasonable to treat Plaintiff's complaints of pain. (*Id.*) Seeley declares that his treatment of Plaintiff was proper based on his examinations, review of Plaintiff's medical records, observations of Plaintiff, and Seeley's medical education, training, experience, and accepted medical practice. (*Id.*)

Plaintiff argues that Seeley's second level review of appeal RJD HC 12046765 was done in furtherance of retaliatory acts carried out by Velardi and Newton in denying Plaintiff's Gabapentin prescription. (Doc. 170, at 23, 56.) Plaintiff argues that the denial of the appeal itself shows that Seeley acted with retaliatory intent. (*See Id.*, at 23.) However, Plaintiff has submitted no evidence of retaliatory motive other than his own opinion. Speculation of retaliatory motive is insufficient to survive summary judgment. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014). And, the denial of a grievance does not, without more, constitute a constitutional violation. *See Dicey,* 2015 WL 4879627, at *5. Therefore, Plaintiff has failed to introduce evidence sufficient to show a genuine dispute of material fact as to a causal connection between Seeley's decisions and Plaintiff's protected conduct. Accordingly, it is respectfully recommended that the Court **GRANT** summary judgment in favor of Seeley as to Plaintiff's First Amendment retaliation claim.

### 6. Glynn

Plaintiff claims that Glynn furthered the retaliatory actions taken against him by denying the second level review of appeal RJD HC 12046765. (*See* Doc. 170, at 23; Seeley Decl., Ex. K.) But, Glynn has demonstrated that Plaintiff cannot carry his burden at trial of proving retaliatory motive.

Although Glynn did not personally treat Plaintiff, she did perform second level reviews of Plaintiff's healthcare appeals in her capacity as the Health Care Chief Executive Officer at RJD. (Glynn Decl., ¶ 2.) Glynn's review of this appeal showed that on July 17,

28

2012, Plaintiff was interviewed by Denbela for his complaints of right wrist pain; he was offered NSAIDs for his pain but declined. (Glynn Del., ¶ 24, Ex. G.) Glynn's review showed that on September 18, 2012, Velardi interviewed and examined Plaintiff for his right wrist pain and his request to be prescribed Gabapentin. (*Id.*) However, Plaintiff's medical records and diagnostic testing showed that he had a "low serum Gabapentin level," meaning that he was not taking his Gabapentin as prescribed; he was therefore tapered off in May 2016. (*Id.*) Glynn's review also showed that Velardi determined Gabapentin was not medically indicated and offered Plaintiff a Tegretol prescription, but Plaintiff refused the medication and threatened a lawsuit, claiming that medical staff had falsified his documents. (*Id.*)

Plaintiff argues that the partial denial of the appeal itself shows retaliatory intent. (Doc. 170, at 23.) Plaintiff also argues that the partial granting of the appeal shows that his previous appeals were meritorious and therefore corroborates his claims of retaliation. (*Id.*) However, Glynn's response in appeal RJD HC 12046765 states that the appeal was partially granted insofar as Plaintiff requested his remedies be considered exhausted—not because there was evidence of retaliatory motive. (Glynn Decl., Ex. D.) In fact, Glynn specifically denied Plaintiff's request that the defendants "stop using their position to deny treatment in retaliation" because there was no "indication that [Plaintiff had] been denied medical treatment." (Glynn Decl., Ex. G.) Plaintiff has submitted no evidence showing that Glynn acted with a retaliatory motive. Again, Plaintiff's claim is based on his own speculation, which is insufficient to survive summary judgment, and the denial of a grievance, which alone does not constitute a constitutional violation. *See Wood*, 753 F.3d at 904; *Dicey,* 2015 WL 4879627, at *5. Therefore, Plaintiff has failed to introduce evidence sufficient to show a genuine dispute of material fact as to whether Seeley's decision was substantially motivated by Plaintiff's First Amendment conduct. Accordingly, it is respectfully recommended that the Court **GRANT** summary judgment in favor of Seeley as to Plaintiff's First Amendment retaliation claim.

///

3:14-cv-01525-JLS-RBM

1          7. Canlas

2          Although Canlas is a named defendant, Plaintiff makes no specific argument in his

3   opposition against granting summary judgment for Canlas. In the absence of an opposition,

4   Canlas has demonstrated that Plaintiff cannot carry his burden at trial of proving retaliatory

5   motive.

6          Canlas treated Plaintiff on August 20, 2010. (Canlas Decl., ¶ 5.) At that time,

7   Plaintiff had already been prescribed medication to alleviate the pain from his carpal tunnel

8   surgery: he recommended that Plaintiff continue taking the medication. (*Id.*) Canlas

9   observed that Plaintiff's grip strength, wrist range of motion, and finger abduction and

10  adduction were normal, as were X-rays of Plaintiff's hands. (*Id.*) There were no

11  deformities or atrophy to Plaintiff's wrist, hand, or fingers, and orthopedic surgery was not

12  necessary. (*Id.*) Canlas advised Plaintiff to use a night splint to relieve pain and told him

13  to avoid wrist extension and flexation. (*Id.*)

14         Canlas also examined Plaintiff on November 22, 2010, in response to Plaintiff's

15  request for pain medication. (*Id.*, ¶ 6.) Canlas found no interval change in Plaintiff's

16  medication condition from his prior examination on August 20, 2010. (*Id.*) Canlas

17  continued Plaintiff's Tylenol prescription, ordered a Gabapentin prescription, and

18  discontinued Plaintiff's Elavil prescription. (*Id.*) He informed Plaintiff that depending on

19  the effects of the Gabapentin, he might next prescribe Voltaren gel (an NSAID),

20  transcutaneous electrical nerve stimulation (use of a mild electrical current to relieve pain),

21  Pamelor (an antidepressant that can be effective in pain management), Tegretol (an

22  anticonvulsant medication used to treat pain), or Trileptal (an anticonvulsant used to treat

23  pain.) (*Id.*)

24         Canlas next treated Plaintiff on May 5, 2011 in connection with appeal RJD HC

25  11021319. (*Id.*, ¶ 7.) At the examination, Canlas found no significant change to Plaintiff's

26  hand from his prior exams; he prescribed Voltaren gel but found no medical necessity to

27  increase the dosage of Gabapentin; he advised Plaintiff to do home exercises to help with

28  pain and increase strength. (*Id.*)

Canlas declares that he never took any adverse action against Plaintiff for any reason; he made his decisions with regard to Plaintiff's treatment based on his examinations, his medical judgment of the proper course of treatment, and his education, training, and accepted medical practice. (*Id.*, ¶ 10.) Canlas never knew about Plaintiff's habeas petition, as it was filed in May 2012, a year after Canlas' last interaction with Plaintiff. (*Id.*, ¶ 12.) Plaintiff has submitted no evidence to dispute these facts. It is impossible for Canlas to have been retaliating against Plaintiff in 2010 and 2011 for the exercise of his First Amendment rights in 2012. Based on the record before the Court, Canlas has demonstrated that Plaintiff cannot prove Canlas made his medical decisions because of Plaintiff's protected conduct. Plaintiff has failed to introduce evidence sufficient to show a genuine dispute of material fact as to the retaliation cause of action in its entirety. Accordingly, it is respectfully recommended that the Court **GRANT** summary judgment in favor of Canlas as to Plaintiff's First Amendment retaliation claim.

### B. Conspiracy to Retaliate

To sustain a claim of conspiracy under Section 1983, a plaintiff must show "an agreement or 'meeting of the minds' to violate constitutional rights." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (citing *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989) (en banc)). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.*, at 441. This agreement or meeting of the minds may be inferred on the basis of circumstantial evidence, such as the actions of the defendants. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999). In addition, a conspiracy to violate constitutional rights must be predicated on a viable underlying constitutional claim. *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005). As the Ninth Circuit has held, "[c]onspiracy is not itself a constitutional tort under § 1983," and it "does not enlarge the nature of the claims asserted

/ / /

/ / /

by the plaintiff, as there must always be an underlying constitutional violation." *Lacey v. Maricopa Cnty.,* 693 F.3d 896, 935 (9th Cir. 2012) (en banc).[5]

Conclusory allegations are not enough to support a § 1983 conspiracy claim. *Burns v. County of King,* 883 F.2d 819, 821 (9th Cir. 1989) (per curiam). Although an "agreement or meeting of minds to violate [the plaintiff's] constitutional rights must be shown," *Woodrum v. Woodward County,* 866 F.2d 1121, 1126 (9th Cir. 1989), "[d]irect evidence of improper motive or an agreement to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Mendocino Envtl. Ctr.,* 192 F.3d at 1302. Thus, "an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.,* at 1301.

Here, Plaintiff alleges that on May 10, 2012, Velardi ordered lab work to test Plaintiff's blood for Gabapentin levels and Newton ordered that Plaintiff be tapered off Gabapentin, and both used the results of that lab work to justify their decisions retroactively (Doc. 170, at 24, 46.) He further asserts that each subsequent reviewer or medical examiner was acting in concert to further the retaliatory actions of Velardi and Newton in cancelling his Gabapentin prescription. (*Id.,* at 19-23.)

However, the record before the Court does not show that Velardi and Newton acted in concert. On the contrary, the record shows that Velardi did not order Plaintiff to be tapered off Gabapentin: she only ordered a lab test on May 10, 2012. (Velardi Decl., ¶ 4, Ex. 3.) Additionally, Newton undertook a review of Plaintiff's test results at the behest of his supervisor on May 12, 2012. (Newton Decl., ¶ 5.) Velardi declares that she did not work in agreement with any other health care providers in the California Department of

---

[5] Because the Court recommends summary judgment be granted as to all of Plaintiff's retaliation claims, Plaintiff's claims that Moving Defendants conspired to retaliate necessarily fail. *See Thornton,* 425 F.3d at 1168; *Lacey,* 693 F.3d at 935. However, out of an abundance of caution, the Court also evaluates whether the record shows any genuine dispute as to the other essential elements of a conspiracy claim as argued by Moving Defendants, in the event the District Court comes to a contrary conclusion as to the underlying constitutional violation.

Corrections that treated Plaintiff to deny him medical care in retaliation for any complaints he made regarding the medical care and treatment he was receiving. (Velardi Decl., ¶ 16.) Newton declares that he did not conspire with any other person to cancel any of Plaintiff's medications or to determine what medications to prescribe to Plaintiff; he further declares that he did not ask any other person to deny Plaintiff medical treatment. (Newton Decl., ¶ 9.) The fact that one doctor recommends a lab test, and another interprets that lab test and makes the decision to taper a patient off a drug (that was set to expire anyway) does not demonstrate the two doctors are involved in a conspiracy. It simply means that two doctors are both providing medical treatment in different capacities.

Similarly, all other defendants have declared that they did not act in concert with one another, and that their decisions were based on Plaintiff's examinations and medical records, and accepted medical practices. (Seeley Decl., ¶ 30; Glynn Decl., ¶ 30; Canlas Decl., ¶ 11; Denbela Decl., ¶ 5; Walker Decl., ¶ 12.) And, for the same reasons that the Court cannot find a conspiracy between Velardi and Newton, the Court cannot find a conspiracy between the other defendants.

Denbela's and Walker's names appear on the first level review of appeal RJD HC 12046389. (Walker Decl., Ex. B.) Velardi's and Walker's names appear on the first level review of appeal RJD HC 12046765. (Walker Decl., Ex. D.) Seely's and Glynn's names appear on the second level review of appeal RJD HC 12046765. (Glynn Decl., Ex. G.) But the mere fact that two names appear on the appeals is not evidence of a conspiracy. Each of these appeals shows a series of interviews and reviews conducted by several people over a course of months. Often, these defendants performed multiple roles, either as primary care physicians or as reviewers. But there is no evidence that they came to a "meeting of the minds" and agreed to retaliate against Plaintiff for exercising his rights under the First Amendment. There is no evidence that any of the defendants acted jointly, and there is insufficient evidence to infer an agreement between the them. Although Plaintiff argues that Moving Defendants acted in concert to falsify his medical records to justify their medical decisions, he has not produced evidence to corroborate his

33

conclusions. Conclusory allegations of conspiracy are not enough to support a § 1983 conspiracy claim. *Burns,* 883 F.2d at 821.

Plaintiff has not introduced evidence sufficient to show a genuine dispute of material fact as to whether a meeting of the minds occurred to violate Plaintiff's First Amendment rights. Consequently, no reasonable trier of fact could find that a conspiracy to violate his First Amendment rights existed. Accordingly, it is respectfully recommended that the Court **GRANT** summary judgment in favor of all Moving Defendants with respect to Plaintiff's conspiracy claim.

## VI. CONCLUSION

The Court submits this Report and Recommendation to United States District Judge Janice L. Sammartino under 28 U.S.C. § 636(b)(1)(B) and Rule 72.1(c)(1)(d) of the Local Civil Rules of the United States District Court for the Southern District of California. For the reasons set forth above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order **GRANTING** summary judgment against Plaintiff, and in favor of Moving Defendants, as to all of Plaintiff's claims.

**IT IS ORDERED** that no later than **30 days after submission of this Report and Recommendation**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation." **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **30 days after filing of objections**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v.*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1 | *Duncan,* 158 F.3d 445, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir.

2 | 1991).

3 | **IT IS SO ORDERED.**

4 | DATE: May 22, 2019


HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES MAGISTRATE JUDGE